IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTURY INDEMNITY COMPANY | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 08-5006 |
| URS CORPORATION | : | |

**SURRICK, J.**                                          AUGUST __7__ , 2009

## MEMORANDUM

Presently before the Court is Defendant's Motion to Dismiss or, in the Alternative, for a Stay. (Doc. No. 3.) For the following reasons, Plaintiff's Complaint will be dismissed.

## I.      BACKGROUND

Century Indemnity Company ("Plaintiff") is an insurance company that reimbursed Ashland Chemical Company ("Ashland"), Plaintiff's insured, for environmental remediation costs pursuant to a settlement agreement between Plaintiff and Ashland. Some of Ashland's environmental remediation costs were for services rendered to Ashland by URS Corporation ("Defendant"), a provider of environmental remediation services. Plaintiff alleges that Defendant inflated the invoices that it submitted to Ashland and that Ashland paid the invoices in full and thereafter submitted them to Plaintiff for reimbursement under the settlement agreement. Plaintiff reimbursed Ashland for a percentage of these expenses. Plaintiff now brings a single claim of unjust enrichment against Defendant. Ashland has not been made a party to the case.

### A.      The Settlement Agreement between Plaintiff and Ashland

The relationship between Plaintiff and Ashland dates back over twenty years. In the 1990s, Plaintiff and Ashland disputed whether Ashland's insurance policy covered certain

environmental remediation claims. (Compl., Ex. A at 8.) On March 1, 1996, Plaintiff and

Ashland executed a settlement agreement that resolved the dispute. (Compl. ¶ 3.) Under the

settlement agreement, Plaintiff agreed to reimburse Ashland for 30% of its covered

environmental costs. (*Id.*) Covered environmental costs were defined as "all reasonable and

necessary costs . . . paid by Ashland in connection with an Environmental Claim," subject to

certain exceptions. (*Id.*, Ex. A at 2.) Ashland agreed to submit its environmental costs to

Plaintiff in a monthly report. (*Id.*, Ex. A at 11.) Ashland further agreed to provide Plaintiff with

supporting documentation in the monthly report including (1) the project name or other

information sufficient to identify the claim; (2) contact information for the service provider; (3)

"an itemization of the services performed by each provider including reasonable details to

explain the nature or type of service performed"; (4) the date on which the service was

performed; (5) the hourly rate applicable to each person performing services; (6) the time each

person spent; (7) the total hours used by all persons; and (8) an itemized list of all reimbursable

expenses. (*Id.*, Ex. A at 14.)

Plaintiff had a right to object to any costs that Ashland submitted for reimbursement

under the settlement agreement. (*Id.*, Ex. A at 11.) Within sixty days of receiving Ashland's

monthly report, Plaintiff was required to notify Ashland of any objections to Ashland's

environmental costs. (*Id.*) Plaintiff could then "audit all costs submitted for reimbursement" and

"employ the services of an independent auditing firm(s) to conduct such audits." (*Id.*, Ex. A at

12.)

**B.      The Amended Service Contract between Ashland and Defendant**

The relationship between Ashland and Defendant also dates back over twenty years. In

1988, Ashland contracted with a predecessor of Defendant for environmental remediation services. (Compl., Ex. B.) Ashland and Defendant executed an amended service contract on September 30, 2001. (*Id.*, Ex. D.) Under the amended service contract, Defendant submitted invoices to Ashland based on the environmental remediation services that Defendant provided. (*Id.*) The amended service agreement provides that "the invoicing requirements to accomplish insurance recovery will take precedent." (*Id.*) Ashland had to notify Defendant within fifteen days of any objections to Defendant's invoices. (Compl. ¶ 5.) Defendant had to permit Ashland "access to, at the home office, for review and audit, at all reasonable times, all records and accounts sufficient to support costs and expenses invoiced to Ashland." (*Id.*, Ex. B ¶ 13.2.) The amount of Defendant's invoices was based in part on a labor multiplier. (*Id.*, Ex. D.) The labor multiplier provided for higher or lower hourly rates depending on the employee's job classification and salary, with a higher salary resulting in a higher labor multiplier. (Compl. ¶ 25.) Defendant's invoices listed the hourly rate but not the labor multiplier. (*Id.* ¶ 26.) Defendant's job classifications under the amended service contract included "co-residing," "dedicated," or "as-needed" employees. (*Id.* ¶ 25.) The cost of a "co-residing" employee assumed a "full utilization rate." (*Id.*, Ex. D.) Finally, the amended service contract included a "guaranteed volume" provision. Under this provision, Ashland agreed to provide Defendant with a volume of services equal to $7 million in 2002, $8 million in 2003, and $9 million in 2004. (Compl. ¶ 27.) If Ashland failed to provide Defendant with the guaranteed volumes, Defendant could re-negotiate the hourly labor rates of the labor multiplier. (*Id.*)

## C.    The Invoices that Defendant Submitted to Ashland

In the early 2000s, Ashland employees began to question the invoicing practices between

3

Defendant and Ashland. On February 17, 2002, Ashland's Director of Environmental Remediation, William Olasin, sent an email to nearly a dozen Ashland employees to provide "some explanation and clarification" about the amended service contract. (Compl. ¶ 39; *id.*, Ex. G.) Olasin explained that Ashland wanted to "maximize our insurance recovery [from Plaintiff]" and therefore opened an office in Dublin, Ohio. (*Id.*, Ex. G.) Olasin felt that "[t]his arrangement would provide the lowest multiplier and the lowest rates [under the amended service contract with Defendant]." (*Id.*) Accordingly, Olasin wrote that

> to make this arrangement successful we had to charge the Dublin URS people [*i.e,* Defendant] where we could receive insurance recovery. In other words we had to charge their time to insurance related projects as much as possible. This is why [Defendant's] time is showing up on certain project invoices. Lowest rate and maximum insurance recovery.
> I still think the model and the concept is a sound one, and will ultimately provide the services at the lowest possible, "Total Transaction Cost" (Total Cost - Total Receivable = Total Transaction Cost). So, these charges are legitimate.
> This plays right along into the message I sent a couple of weeks ago. To get the best ba[n]g for the Ashland buck we must utilize [Defendant's employees in Dublin] to the maximum. In addition we must be continually thinking how can we pull more work into the Dublin office from elsewhere in the country.

(*Id.*)

Olasin's email prompted a reply from Bradley S. Rogers ("Rogers"), a project manager at Ashland, who asked, "[a]re you saying that we are to approve [Defendant's] Dublin staff charges on projects that they did not work on, for the purpose of insurance recovery?" (*Id.*; *id.* ¶ 40.) Olasin responded, "Brad – the answer is yes." (*Id.*, Ex. G; *id.* ¶ 40.) Olasin explained that Ashland has "always paid for administrative time through the multiplier" but "administrative time is not a part of the multiplier [in Dublin] where at every other location it is." (*Id.*, Ex. G.) Olasin further explained that

since by contract we have guaranteed that the Dublin staff is 100% billable . . . , it is critical that we use them 100%. . . . I, as well as everyone is still a little out of their normal comfort zone.  I am sure that will ease over time.

(*Id.*)  Several months later, Rogers complained in a code of conduct questionnaire that he was uncomfortable with the relationship between Ashland and Defendant and that Defendant was billing non-productive "stand-by time" as project management time, particularly to projects covered by insurance.  (*Id.* ¶ 53.)

Rogers was not the only Ashland employee to question Ashland's invoicing practices. On July 2, 2002, Ashland's Project Manager James E. Vondracek wrote an email to various employees of Defendant and Ashland with a subject line, "how do you pick'm?"  (*Id.*, Ex. E.)  In the email, Vondracek questioned Defendant's "project management" costs by pointing out that $203 worth of data management resulted in "project management" costs of nearly $4000 and the involvement of four of Defendant's billing employees.  (*Id.*)  Vondracek wrote, "ouch. . . . why not dump time on the active projects? . . . I recommend we come to an agreement on a process . . . that would designate how much and which projects bear this burden."  (*Id.*)  Vondracek concluded the email with the remark, "[a]pproving invoices that come no where near reflecting real[i]ty makes me extremely uncomfortable. . . ."  (*Id.* (periods in original); *see also id.* ¶ 30.)

In 2003, Ashland began charging Defendant $20,000 per month in rent for the overhead associated with Defendant's employees who co-resided at the Dublin office.  (*Id.* ¶ 47.)  In response, Defendant added $5.00 per hour to the hourly salary used to calculate the hourly billing rate that it charged to Ashland.  (*Id.* ¶ 48.)  Defendant kept track of the $5.00 surcharge with a spreadsheet, and when the amount reached $20,000 in a given month, Defendant removed the surcharge.  (*Id.*)  The purpose of the $5.00 surcharge was to allow Ashland to recoup the $20,000

monthly overhead charge through its insurance coverage. (*Id.*) Ashland had a similar arrangement with Defendant for a web-based software program, the initial cost of which was borne by Ashland. (*Id.* ¶ 50.)

Ashland is not alleged to have questioned Defendant's invoices, withheld payment, or requested an audit in accordance with the amended service contract, notwithstanding the complaints of Ashland's employees. (*Id.*, Exs. B, D.) Similarly, Plaintiff is not alleged to have questioned Ashland's reimbursement claims, withheld payment, or requested an audit in accordance with the settlement agreement. (*Id.*, Ex. A.)

### D.     Plaintiff Receives an Anonymous Whistleblower Letter

In 2006, Plaintiff received an anonymous whistleblower letter stating that "Ashland may be engaged in insurance fraud." (*Id.*, Ex. C.) The letter stated that "Ashland has encouraged [Defendant's] personnel to bill 100% of their time to Ashland's insurance reimbursable projects, so that Ashland can maximize their insurance recovery while negotiating a lower bill rate from [Defendant]." (*Id.*) According to the letter, Defendant billed Ashland for employee standby time as a "project management" cost rather than using an overhead account. (*Id.*) The letter stated that Defendant billed Ashland for a Christmas party, a golf outing, and an open house in Kentucky. (*Id.*) The letter concluded that "Ashland and [Defendant] have been engaged in, what appears to be, a pattern of fraud and deceit for over five years and for a portion of more than $25 million in reimbursable expenses." (*Id.*)

### E.     Plaintiff Files a Complaint Against Defendant, but Leaves out Ashland

On October 10, 2008, Plaintiff filed a Complaint against Defendant in the Philadelphia County Court of Common Pleas alleging unjust enrichment. (*See* Compl.) Plaintiff did not

include any claims against Ashland.[1]  On October 22, 2008, Defendant removed the action to this Court and, two days later, filed the instant Motion to Dismiss, or, in the Alternative, for a Stay.[2] (*See* Doc. Nos. 1, 3.)

## II.    LEGAL STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To state a claim upon which relief can be granted, a complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  In other words, a complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  When assessing whether the complaint satisfies this standard, courts must treat a complaint's allegations as true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  However, courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 1949.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 1950.  The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint.  *See City of Pittsburgh v. W.*

---

[1] The settlement agreement between Plaintiff and Ashland includes an arbitration clause. (*See* Compl., Ex. A ¶ 23 (providing for mandatory arbitration of "any dispute arising out of this Agreement").)  To date, Plaintiff has not initiated an arbitration proceeding against Ashland. (Doc. No. 5 at 18 (noting that "[h]ere, there is no arbitration pending"); Doc. No. 7 at 6 (noting same).)

[2] It is worth noting that since the filing of the instant Motion, counsel have filed many submissions challenging one another's ethics, seeking to re-argue issues already before the Court, and alleging various misconduct.  More often than not, counsel's briefing has been more argumentative than substantive.  Counsel appear to have carried over this style from the state court proceedings, the record of which contains similar histrionics.  The record in this case would be far less extensive if counsel had focused on the issues rather than on the adversary.  Counsel's approach has not been helpful to the Court.

*Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998); *see also* 5B Wright & Miller, Fed. Practice & Procedure: Civil 3d § 1357 at 376 (West 2004) (noting that in deciding a motion to dismiss under Rule 12(b)(6), "[n]umerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, . . . items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned") (citations omitted).  Courts should generally grant plaintiffs leave to amend their claims before dismissing a complaint that is merely deficient.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

## III.   DISCUSSION

In order to state an unjust enrichment claim under Pennsylvania law, a plaintiff must allege that: "(1) [the] plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit." *Com. ex. rel. Pappert v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127, 1137 (Pa. Commw. Ct. 2005); *see also Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 833 (Pa. Super. Ct. 2008) (noting same).  A claim for unjust enrichment sounds in quasi-contract.  *See Sevast v. Kakouras*, 915 A.2d 1147, 1153 n.7 (Pa. 2007) ("An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law.") (citation omitted).  "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *AmeriPro Search, Inc., v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001).  "[U]nlike true contracts, quasi-contracts are not based on the

8

apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice." *Sevast*, 915 A.2d at 1153 n.7 (quoting *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 449 (Pa. 1969)).

Because of the quasi-contractual nature of an unjust enrichment claim, the doctrine does not apply "when the relationship between the parties is founded on a written agreement or express contract." *Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985) (quoting *Schott*, 259 A.2d at 448). Indeed, "[d]ismissal of an unjust enrichment claim is appropriate upon a motion to dismiss when the relationship between the parties is founded on a written instrument." *Harold ex rel. Harold v. McGann*, 406 F. Supp. 2d 562, 579 (E.D. Pa. 2005) (citations omitted); *see also Halstead v. Motorcycle Safety Found., Inc.*, 71 F. Supp. 2d 455, 459 (E.D. Pa. 1999) ("Although plaintiffs are free to pursue the alternative theories of recovery of breach of contract and unjust enrichment, the finding of a valid contract prevents a party from recovering for unjust enrichment."). A claim of unjust enrichment may, however, "be pled in the alternative to a breach of contract claim, although the finding of a valid contract would prevent a party from recovering [under an unjust enrichment theory]." *Cornell Co. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 266 (E.D. Pa. 2007); *see also Sheinman Provisions, Inc., v. Nat'l Deli, LLC*, No. 08-0453, 2008 WL 2758029, at *4 (E.D. Pa. July 15, 2008) (dismissing unjust enrichment claim notwithstanding pleading of claim in the alternative since a valid contract governed parties' relationship and "Pennsylvania law prohibits unjust enrichment claims where a contract governs the relationship of the parties").

Thus, whether the doctrine of unjust enrichment applies "depends on the unique factual circumstances of each case." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993). In

9

determining if the doctrine applies, courts focus "not on the intention of the parties, but rather on whether the defendant was unjustly enriched." *Stoeckinger*, 948 A.2d at 833; *see also Styer*, 619 A.2d at 350 ("[T]he most significant element of the doctrine is whether the enrichment of the defendant is *unjust*."); *Limbach v. City of Phila.*, 905 A.2d 567, 577 (Pa. Commw. Ct. 2006) ("The polestar of the unjust enrichment inquiry is whether the defendant has been unjustly enriched; the intent of the parties is irrelevant.").

"Plaintiffs need not have directly dealt with each defendant in order to allege a claim of unjust enrichment against them." *Global Ground Support, LLC, v. Glazer Enter., Inc.*, 581 F. Supp. 2d 669, 676 (E.D. Pa. 2008). This is because "[t]he claim of unjust enrichment simply requires that [a] plaintiff 'confer' benefits on a defendant; it does not require that [the] plaintiff 'directly confer' those benefits." *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006) (citations omitted); *see also Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) (noting that to state a claim for unjust enrichment, a plaintiff must allege, *inter alia*, the existence of "benefits conferred on one party by another") (citation omitted). Thus, the Supreme Court of Pennsylvania has held that a subcontractor who performed work on a shopping mall may recover from the shopping mall owner under an unjust enrichment theory even if the subcontractor did not have a direct contractual relationship with the owner. *D.A. Hill Co. v. CleveTrust Realty Inv.*, 573 A.2d 1005, 1009 (Pa. 1990). Likewise, a purchaser of an airplane need not have purchased the airplane's crankshaft, which was defective and had to be replaced, directly from the manufacturer in order to have "conferred benefits" on the manufacturer through its purchase of the aircraft. *Powers v. Lycoming Engines*, No. 06-2993, 2007 WL 2702705, at *3 (E.D. Pa. Sept. 12, 2007).

10

It is clear, however, that the benefit to the defendant must be more than remote to support an unjust enrichment claim. *See, e.g., Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000). In *Allegheny*, the plaintiff hospitals alleged that the defendant tobacco companies were unjustly enriched by the hospitals' coverage of smokers' medical costs. *Id.* The plaintiffs argued that they saved the tobacco companies from bearing the costs of their wrongful conduct of marketing the tobacco. *Id.* at 433-34. The court dismissed the plaintiffs' unjust enrichment claim, holding that the tobacco companies had no obligation to pay the medical expenses of smokers and that the hospitals' provision of medical services therefore did not benefit the tobacco companies. *Id.* at 447. The court reasoned that

> since the Hospitals had an independent obligation to provide health care to nonpaying patients, incidental benefit to the Tobacco Companies is not enough to maintain an action; the nonpaying patients got the main benefit, not the Tobacco Companies.

*Id.* (citing Restatement of Restitution § 106 (1937) ("A person who, incidentally to the performance of his own duty . . . has conferred a benefit upon another, is not thereby entitled to contribution.")). The court observed that "the distance between the Hospitals' provision of medical care and the Tobacco Companies' alleged benefit show that the benefit was not unjust." *Id.; see also Steamfitters Local Union No. 420 v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999) ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim . . . because of the remoteness of plaintiffs' injuries from defendants' wrongdoing."), *cert. denied*, 528 U.S. 1105 (2000); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 851 (6th Cir. 2003) (applying Tennessee law) (dismissing group health insurance subscribers' unjust enrichment claim against tobacco manufacturers on remoteness grounds).

At least one court applying Pennsylvania law has dismissed an unjust enrichment claim

brought by a third-party payor on remoteness grounds. *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 484 F. Supp. 2d 973, 985 (D. Minn. 2007) (applying Pennsylvania law). The plaintiffs in *Guidant* included a non-profit trust that paid all or part of the cost of its participants' medical expenses, including expenses associated with implantable heart defibrillators manufactured by the defendant. *Id.* at 981. The defibrillators were defective and had to be replaced. *Id.* at 976. The non-profit trust that paid for the participants' defibrillators sued the manufacturer under a theory of unjust enrichment. *Id.* at 985. The non-profit trust, as a third-party payor, alleged that it "conferred a benefit upon [the manufacturer] by paying for the devices at issue on their insureds' behalf, that [the manufacturer] knew and accepted these payments, and that [the manufacturer's] retention of these payments would be inequitable." *Id.* The court dismissed the third-party payor's unjust enrichment claim as "too remote" and observed that the third-party payors had an adequate remedy of law through a properly pled subrogation claim. *Id.* (citing *Steamfitters*, 171 F.3d at 937).

*Allegheny* does not preclude a third-party payor from stating a claim of unjust enrichment, however, when the benefit is not remote. *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (Greenaway, J.) (applying Pennsylvania law). The plaintiffs in *K-Dur* included third-party payors such as health insurers and employee benefit funds that paid for K-Dur, a prescription drug used to treat patients with depleted potassium levels. *Id.* at 523. The defendants manufactured the K-Dur. *Id.* at 522-23. The plaintiffs alleged that the defendants set artificially high prices and brought an unjust enrichment claim under Pennsylvania law. *Id.* at 526, 544. The court denied the defendants' motion to dismiss the unjust enrichment claim, noting that the plaintiffs' purchase of K-Dur was a benefit conferred on the manufacturer. *Id.*

12

The court rejected the defendants' reliance on *Allegheny* for the proposition that an unjust enrichment claim requires a direct relationship between the plaintiff and the defendant, observing that "[i]n *Allegheny*, plaintiffs sought to recover the indirect costs of tobacco use. Here, Plaintiffs seek to recover the actual cost of K-Dur itself, not outlays made for coverage of health risks associated with K-Dur." *Id.* at 545. The court found this distinction to be "a critical one." *Id.* The court rejected the defendants' argument that third-party payors "do not have a right to sue for unjust enrichment because they had a legal obligation to reimburse their insureds' purchases of K-Dur," noting that

> Defendants cite no applicable cases standing for the proposition that third-parties are precluded from seeking recovery from defendants that overcharge those whose costs third parties reimburse. The relevant inquiry is whether there is a sufficient nexus between the conferrer of the benefit and the recipient, not whether there is a legal obligation to pay on the part of a third-party payor.

*Id.* at 546.

The instant case turns on the relationship between Plaintiff and Defendant, a relationship which cannot be divorced from two pertinent contracts. *See id.* The first contract is the settlement agreement between Plaintiff and its insured, Ashland, that governs Plaintiff's reimbursement of 30% of Ashland's covered environmental remediation expenses. The second contract is the amended service contract between Ashland and Defendant that governs Defendant's provision of environmental remediation services to Ashland. Each contract is independent and stands alone. There is no written instrument that directly links Plaintiff with Defendant. Defendant submitted no invoices to Plaintiff, and Plaintiff did not reimburse Defendant for any expenses. Ashland paid 100% of Defendant's invoices to Defendant. Plaintiff thereafter reimbursed 30% of Ashland's covered expenses to Ashland. Clearly, the relationship

13

between Plaintiff and Defendant is indirect.  However, as explained above, Plaintiff need not have a direct relationship with Defendant in order to state an unjust enrichment claim.  *See Global Ground Support*, 581 F. Supp. 2d at 676 ("Plaintiffs need not have directly dealt with each defendant in order to allege a claim of unjust enrichment against them."); *Baker*, 440 F. Supp. 2d at 420 ("The claim of unjust enrichment simply requires that plaintiff 'confer' benefits on a defendant; it does not require that plaintiff 'directly confer' those benefits."); *see also Benchmark Group, Inc., v. Penn Tank Lines, Inc.*, No. 07-2630, 2008 WL 2389463, at *5 (E.D. Pa. June 11, 2008) ("[T]he essence of an unjust enrichment claim is that there is no direct relationship between the parties under which the plaintiff may recover.") (citation omitted).

Thus, the appropriate inquiry is whether the benefit, if any, that Plaintiff conferred on Defendant was more than remote or incidental.  Plaintiff's unjust enrichment claim fails because Plaintiff does not plead facts to support this inference.  The settlement agreement shows that Plaintiff's payments to Ashland did not simply pass through Ashland to reach Defendant. Rather, under the settlement agreement, Plaintiff reimbursed Ashland for 30% of the "reasonable and necessary costs" paid by Ashland.  Whether certain costs were "reasonable and necessary" was determined by Plaintiff and Ashland.  Ashland submitted a monthly report of its costs to Plaintiff with supporting documentation, including, *inter alia*, contact information for the service provider that Ashland used and an itemization of the services performed with "reasonable details to explain the nature or type of services performed."  Plaintiff had sixty days in which to notify Ashland of any objections.  If Plaintiff objected to any part of Ashland's report, Plaintiff could "audit all costs submitted for reimbursement" and employ an independent auditing firm for that purpose.  There is no allegation that Plaintiff enforced any of these contractual rights.  In any

14

event, Ashland had already paid Defendant by the time that Ashland submitted its report to Plaintiff. Defendant would have been no better off – and no worse off – if Plaintiff had enforced its contractual right to object to any of Ashland's reports or even if Plaintiff withheld its payment altogether.

The settlement agreement therefore belies Plaintiff's argument that Defendant "obtained a benefit from [Plaintiff] through insurance payments made by [Plaintiff] for [Defendant's] activities that were wholly unrelated to insurance reimbursable projects." (Doc. No. 5 at 2.) Defendant may have obtained a benefit, but it was not conferred by Plaintiff. Any benefit conferred by Plaintiff is distanced not just by the terms of the settlement agreement, but also by the terms of the amended service contract. Under the amended service contract, Ashland could "review and audit, at all reasonable times, all records and accounts sufficient to support costs and expenses invoiced to Ashland." (Compl., Ex. B ¶ 13.2.) Thus, any benefit from Plaintiff to Defendant was filtered through two independent layers of auditing: Plaintiff had a right to audit and approve any costs submitted by Ashland pursuant to the settlement agreement, and Ashland had a right to audit and approve any costs submitted by Defendant pursuant to the amended service contract. Either of these provisions could have affected or even eliminated Plaintiff's obligation to reimburse Ashland. Defendant, of course, would have been compensated by Ashland regardless of Plaintiff's *post facto* reimbursement.

Plaintiff's position is like that of the hospitals in *Allegheny*. In *Allegheny*, the hospitals' provision of medical services made no difference to the tobacco companies because the tobacco companies had no independent obligation to provide medical services. 228 F.3d at 447. The benefit to the tobacco companies was too remote. *Id.* In this case, Plaintiff's payments to

Ashland under the settlement agreement made no difference to Defendant because Ashland was obligated to pay – and already did pay – Defendant's invoices under the amended service contract. The magnitude of Plaintiff's payment depended on the settlement agreement and the amended service contract. The fact that Defendant may not have benefitted but for Plaintiff's existence is not enough for Plaintiff to state an unjust enrichment claim. *See Walter v. Magee-Women's Hosp.*, 876 A.2d 400, 407 (Pa. Super. Ct. 2005) ("It is well-settled that 'the doctrine [of unjust enrichment] does not apply simply because the defendant may have benefitted as a result of the actions of the plaintiff.'") (citation omitted). Defendant had already been fully compensated by Ashland before any theoretical residual payment from Plaintiff under the settlement agreement reached Defendant. *Cf. K-Dur*, 338 F. Supp. 2d at 544 (denying motion to dismiss unjust enrichment claim brought by third-party payor plaintiffs that reimbursed consumers for defendant's drugs sold at artificially high prices where plaintiffs were obligated to reimburse consumers for cost of defendant's drugs, at whatever price defendant determined, without ability to question or control its payment through an audit or otherwise). The benefit would be too remote even assuming that Plaintiff's payment had made its way past Ashland to Defendant. The court in *Guidant* dismissed a third-party payer's unjust enrichment claim as "too remote" where the third-party payer purchased the defendant's defibrillators for its plan participants. 484 F. Supp. 2d at 985. The indirect benefit to Defendant here is even more remote than the benefit at issue in *Guidant*.

Plaintiff's unjust enrichment claim also fails because Defendant's acceptance and retention of any benefit was not unjust. *See Halstead*, 71 F. Supp. 2d at 459 (noting that an unjust enrichment claimant "must show that the party against whom recovery is sought either

16

wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider") (citations omitted).  For the reasons set forth above, Defendant would have received the benefit of compensation for its services regardless of Plaintiff's *post facto* reimbursement to Ashland.  It is conceivable that Defendant's retention of Ashland's payments was unjust with respect to Ashland (since Ashland paid Defendant's invoices), but Ashland has not brought the unjust enrichment claim and Plaintiff asserts no claims against Ashland. *Cf. United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, No. 02-5702, 2009 WL 1288962, at *10 (D.N.J. May 7, 2009) (denying motion to dismiss federal government's unjust enrichment claim against defendant hospital that exaggerated charges for patient care to obtain reimbursement from the government through Medicare; the hospital inflated charges for its own services).  We cannot conclude that Defendant's retention of a benefit was unjust when Defendant received only an incidental benefit from Plaintiff. *See, e.g., Allegheny*, 228 F.3d at 447 (affirming dismissal of unjust enrichment claim and observing that "the distance between the Hospitals' provision of medical care and the Tobacco Companies' alleged benefit show that the benefit was not unjust").

Defendant's retention of a benefit was not unjust for the additional reason that Plaintiff had a remedy.  Plaintiff, Ashland, and Defendant are all sophisticated business entities.  If Defendant's invoices were as questionable as Plaintiff alleges in the Complaint, Plaintiff could have challenged them before making payment to Ashland. (*See* Compl., Ex. B ¶ 5 (providing that Plaintiff shall provide Ashland with written notice of any objections to "any amounts included in [the] costs" of services within sixty days of the date of receipt of "such statements and supporting documentation").)  Plaintiff also could have had an independent auditor examine

17

the invoices before making payment. (*See id.* ¶ 21(a) (providing that Plaintiff has a right "to audit all costs submitted for reimbursement").)  Plaintiff instead chose to make the payments to Ashland without further examination and without seeking a contract remedy.[3]  Having failed to take advantage of its contractual rights, Plaintiff asks the Court to invoke an equitable remedy of unjust enrichment.  An equitable remedy of unjust enrichment is not appropriate. *See Curley v. Allstate Ins. Co.*, 289 F. Supp. 2d 614, 619 (E.D. Pa. 2003) ("Pennsylvania law has long recognized that the doctrine of unjust enrichment is unavailable where . . . the relationship of the parties is founded on a written agreement or express contract.") (citations omitted); *see also, e.g., Norris v. Grosvenor Mktg., Ltd.*, 803 F.2d 1281, 1287 (2d Cir. 1986) ("An equitable claim cannot proceed where the plaintiff has had and let pass an adequate alternative remedy at law.") (citations omitted).  Although the contract at issue here is not between Plaintiff and Defendant, the availability of an adequate remedy at law militates against a finding of injustice. *See Goadby v. PECO*, 639 F.3d 117, 122 (3d Cir. 1981) (noting the "basic tenet of equity jurisprudence: if an adequate remedy at law exists, equitable relief will not be granted") (citations omitted).  This case does not cry out for the equitable relief that Plaintiff requests.

This is not to say that Plaintiff is without a cause of action.  Plaintiff might have a breach of contract claim or an unjust enrichment claim against Ashland.  Plaintiff also might have a tort claim against Ashland and/or Defendant for intentional fraud.  Plaintiff recognized as much in its briefing as it relates to Defendant. (*See* Doc. No. 22 at 5 (noting that "the concept is apparently rooted in insurance fraud"); Doc. No. 5 at 5 n.1 (noting that Plaintiff "sought to conduct pre-

---

[3] Plaintiff does not allege that Ashland breached the settlement agreement by submitting inflated invoices for reimbursement.

complaint discovery prior to filing its complaint [in state court] so that it could also state a claim of fraud with particularity" and that Plaintiff "reserves the right to amend its complaint to assert a claim of fraud as soon as discovery permits [Plaintiff] to plead its fraud claim with particularity").) We agree that a fair reading of Plaintiff's Complaint places this dispute more in the realm of intentional tort. A claim of intentional fraud is different, however, from the quasi-contractual claim of unjust enrichment that Plaintiff brought against Defendant. *See Fed. Ins. Co. v. Me. Yankee Atomic Power Co.*, 183 F. Supp. 2d 76, 86 n.16 (D. Me. 2001) ("[I]t is often said that unjust enrichment, along with tort and contract, is a distinct source of available civil liability.") (citation omitted).[4] Plaintiff asserts no claim of intentional fraud. We express no opinion about the possible merits of any alternative claims, but we mention them to underscore the quasi-contractual nature of the unjust enrichment claim before us. Plaintiff cannot state this claim against Defendant because the benefit is too remote, *see, e.g.*, *Guidant*, 484 F. Supp. 2d at 985 (holding same in the context of a third-party payor), and the circumstances are not unjust.

---

[4] The principles of unjust enrichment are distinct from principles of tort. *See* Douglas Laycock, *The Scope and Significance of Restitution*, 67 Tex. L. Rev. 1277, 1284 (May 1989) ("Many cases of unjust enrichment are also covered by other principles, including the basic rules of tort and contract. If defendant steals a hundred-dollar bill, he is unjustly enriched in the amount of one hundred dollars. But he has also committed a tort; indeed, it is the tort that makes his enrichment unjust. The tort damages are also one hundred dollars. If defendant is solvent, it will rarely matter whether plaintiff recovers one hundred dollars in damages for the tort or one hundred dollars in restitution of the unjust enrichment."). Nevertheless, it should be noted that "[i]n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim." *Steamfitters*, 171 F.3d at 936.

## IV.    CONCLUSION

For these reasons, Defendant's Motion will be granted, and the Complaint will be dismissed with prejudice.

An appropriate Order will follow.

BY THE COURT:

R. Barclay Surrick, J.